# 2002 DTA 131

**TRIBUNAL DE CIRCUITO DE APELACIONES
CIRCUITO REGIONAL DE BAYAMON, PANEL II**

ADA VEGA VEGA, *et als*
Demandantes-Recurridos

v.

IVAN CEREZO DE LA ROSA, *et als*
Demandados-Recurrentes

Núm. KLAN-2002-00329

San Juan, Puerto Rico, a 26 de agosto de 2002

Panel integrado por su Presidente, Juez Arbona Lago
y los Jueces Urgell Cuebas y Aponte Hernández

Arbona Lago, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

**Hechos**

La presente causa de acción trata sobre una reclamación de daños y perjuicios a raíz de un accidente automovilístico ocurrido el 7 de marzo de 1999 en el Expreso José de Diego (Dorado/Bayamón). Estuvieron envueltos dos autos, uno de ellos conducido por el codemandado Iván Cerezo de la Rosa, y el otro por Carlos Oyola Rivera, quien pereció en el accidente. Este último iba acompañado por la codemandante Ada Vega Vega.

La acción judicial del epígrafe fue presentada ante Instancia por la Sra. Ada Vega y otros ocho codemandantes contra Iván Cerezo, su esposa y la sociedad legal de gananciales compuesta por ambos. ■ Universal Insurance Company (Universal) fue incluida por ser ésta la compañía aseguradora del vehículo conducido por el codemandado Iván Cerezo. La póliza es una de responsabilidad pública mediante la cual Universal se comprometía a responder con una indemnización que no excedería los $100,000 por cada persona que sufriese daño, hasta un máximo de $300,000 por la totalidad del accidente. Conforme a los términos de la póliza Universal tenía también la obligación de defender y brindar representación legal adecuada a todos los asegurados, mientras no se excediera o extinguiera el límite máximo de la cubierta o se transigiera la acción.

El 11 de septiembre de 2000, Universal consignó $200,000 en la Secretaría del Tribunal de Primera Instancia, Sala Superior de Bayamón, alegando que dicha suma representaba la cubierta máxima conforme los términos de la póliza, es decir $100,000 por cada persona lesionada directamente en el accidente y reclamante en autos. Nada se dispuso en cuanto a la cubierta por daños a la propiedad. Luego de consignado el dinero, Universal le solicitó al Tribunal que dictara sentencia parcial ordenando el archivo de la demanda en cuanto a Universal.

El 17 de octubre de 2000, el hermano foro de instancia dictó sentencia sumaria parcial mediante la cual aceptó la suma de dinero consignada por Universal y ordenó la desestimación de las alegaciones levantadas contra esta entendiendo que la aseguradora había *"... depositado la totalidad de la cubierta"*. El dictamen parcial cumplió con lo dispuesto por la regla 43.5 de Procedimiento Civil, 32 L.P.R.A Ap. III, R. 43.5.

Conforme a lo anterior, Universal le instruyó a sus abogados que renunciaran a la representación legal de Iván Cerezo y demás codemandados y dio así por terminada su obligación para defender y proveer representación legal a los asegurados, según los términos establecidos en la póliza de seguro.

En diciembre de 2000, los demandantes solicitaron el desembolso de los $200,000 consignados en la Secretaría del Tribunal, por lo que se expidió el correspondiente cheque a nombre de seis de los nueve codemandantes.

Posteriormente, la parte codemandada-recurrente del epígrafe (Iván Cerezo *et al.*), por conducto de su nueva representación legal, presentó ante el foro de Instancia una serie de escritos, entre los cuales figuran las siguientes mociones.

a) El 7 de mayo de 2001, moción de relevo de sentencia al amparo de la regla 49.2 de Procedimiento Civil, con el propósito de impugnar la sentencia parcial dictada a favor de Universal.

b) Impugnación del cheque expedido por Secretaría a favor de seis de los nueve demandantes. (27 de abril de 2001)

c) Solicitud de recusación de la representación legal de los demandantes, alegando la existencia de conflicto de interés. (27 de abril de 2001)

d) Demanda de co-parte contra Universal por haber renunciado a la representación legal de Iván Cerezo y demás codemandados, a pesar de estar aún pendiente la reclamación de daños a la propiedad, los cuales estaban también cubiertos por la póliza de seguro. (19 de julio de 2001)

e) Demanda de tercero contra Universal por incumplir su obligación de proveer cubierta y representación legal a los demandados por los daños a la propiedad reclamados, en violación del contrato de seguros pactado entre las partes. (23 de julio de 2001)

El 18 de septiembre de 2001, Universal y los demandantes comparecieron ante el tribunal mediante escrito titulado *"Estipulación de Transacción Parcial y Relevo"*, en el cual pactaron los daños a la propiedad en $800 dólares. En esa misma fecha, Universal presentó moción en oposición al relevo de la sentencia dictada a su favor y solicitó la desestimación de la demanda de tercero presentada en su contra, aduciendo haber ya consignado y desembolsado los límites máximos dispuestos en la póliza, aplicables al caso, y haber transado la reclamación respecto a los daños a la propiedad. Los codemandados (Iván Cerezo *et al.*) se opusieron oportunamente a dicha moción y solicitaron de Instancia que dictara sentencia sumaria parcial en lo que respecta al incumplimiento de contrato por parte de Universal por haberle suspendido la representación legal. Solicitaron además que el tribunal se abstuviera de aprobar el acuerdo transaccional entre Universal y los demandantes respecto a los daños a la propiedad, hasta tanto resolviese en cuanto a las múltiples mociones relacionadas con el desembolso de fondos aprobado a favor de los demandantes.

El 25 de febrero de 2002, luego de varios incidentes procesales, el Tribunal *a quo* dictó resolución mediante la cual declaró No ha lugar la solicitud para que se dejara sin efecto la sentencia parcial dictada a favor de Universal y Con lugar la desestimación de la demanda de co-parte y de tercero radicada en contra de Universal. Conforme a ello, denegó tanto la moción de sentencia sumaria presentada por los codemandados (Iván Rosa *et al.*), así como la solicitud de éstos para que se dejara en suspenso la aprobación del acuerdo transaccional, el cual decidió aprobar.

La moción de reconsideración presentada por los codemandados fue denegada por Instancia y luego notificada el 18 de marzo de 2002.

Inconforme con lo resuelto el 11 de abril de 2002, la parte demandada-recurrente presentó la causa del epígrafe y le imputó a Instancia la comisión de cinco errores.

*"Erró el Tribunal de Instancia al no dejar sin efecto la sentencia a favor de Universal Insurance, habida cuenta del hecho de que contrario a lo alegado por Universal, a la fecha en que solicitó la desestimación a su favor no había agotado los límites de su cubierta y tampoco unió a su moción copia de la póliza de seguros induciendo de esa forma al tribunal a error.*

*Erró el Tribunal de Instancia al denegar la solicitud de relevo de sentencia de los recurrentes y al denegar la demanda contra tercero y la demanda contra coparte entablada contra Universal Insurance por los recurrentes tomando en cuenta el incumplimiento de contrato de Universal que privó a los recurrentes de defensa al menos por más de un año.*

*Erró el Tribunal de Instancia al denegar la demanda de coparte y la demanda contra terceros de los recurrentes contra Universal Insurance amparándose en que todas las cubiertas ya habían sido agotadas por el acuerdo de transacción por daños a la propiedad entre Universal y los demandantes sin antes haber dirimido la controversia en torno a si el representante legal de los demandantes contaba con autoridad legítima para dar*

*curso a la transacción y obviando el hecho de que el automóvil no estaba a nombre de ninguno de los demandantes.*

*Erró el Tribunal de Instancia al denegar la solicitud de relevo de sentencia de los recurrentes y al denegar la demanda contra tercero y la demanda de coparte entablada contra Universal Insurance por los recurrentes obviando el deber de defensa que Universal tenía hacia los recurrentes, deber que es independiente de la cubierta.*

*Erró el Tribunal de Instancia al no conceder la moción de sentencia sumaria parcial sometida por la parte recurrente contra Universal Insurance de coparte entablada contra Universal."*

La causa está sometida y procedemos a resolver.

## Exposición y análisis

### I

El Artículo 1.020 del Código Seguros de Puerto Rico, 26 L.P.R.A § 102, define el contrato de seguro como aquél *"mediante el cual una persona se obliga a indemnizar a otra o a pagarle o proveerle un beneficio específico o determinable al producirse un suceso incierto previsto en el mismo."* Cruz, Rolando, *Derecho de Seguros* 1 (1ra ed., **Publicaciones JTS**, 1999). Por tanto, protege al asegurado contra la responsabilidad civil de éste por los daños o lesiones causadas a terceras personas. *Díaz Ayala v. E.L.A.,* **2001 J.T.S. 49**.

El artículo 11.259 del Código de Seguros de Puerto Rico, 26 L.P.R.A. § 1125, establece que los contratos de seguros deben interpretarse de forma integral, a base de la totalidad de sus términos y condiciones. Es norma reiterada en esta jurisdicción que todo contrato de seguros, al igual que cualquier otro contrato, constituye la ley entre las partes, siempre y cuando concurran las tres condiciones indispensables para su validez, es decir, consentimiento de los contratantes, objeto cierto, y causa de la obligación que se genera. Artículos 1230, 1213 del Código Civil de Puerto Rico, 31 L.P.R.A. § 3451, 3391. *Véase General Accident v. Ramos Díaz,* **99 J.T.S. 94**; *José Iván Torres v. E.L.A.*, 131 D.P.R. 640 (1992); *García Curbelo v. A.F.F.*, 127 D.P.R. 747 (1991).

De otra parte, los contratos de seguro son contratos de adhesión, por lo que deben interpretarse liberalmente a favor del asegurado. *Ramos v. Ortiz Rollet*, 137 D.P.R. 981 (1995); *González v. Coop. Seguros de Vida*, 117 DPR 659, 662 (1986). Esta norma de hermenéutica sólo aplica en cuanto a aquellas cláusulas confusas, y no cuando se trata de cláusulas de texto claro y libre de ambigüedades, aun cuando las cláusulas sean favorables a los intereses del asegurador. *Torres v. ELA*, 130 D.P.R. 640 (1992). Es norma reiterada que el lenguaje utilizado en los contratos de seguro debe ser interpretado, de ordinario, en su significado común y corriente, sin ceñirse demasiado al rigor gramatical, sino al uso general y popular de las voces. *Pagán Caraballo v. Silva*, 122 D.P.R. 105, 110 (1988); *Morales Garay v. Roldán Coss*, 110 D.P.R. 701 (1981).

De otra parte, debe mantenerse presente que, en caso de surgir alguna duda en la interpretación de una póliza, ésta debe resolverse de manera que se logre el objetivo y propósito de la cubierta, es decir, proveer protección al asegurado. *Díaz Ayala v. E.L.A., supra.* Por tal razón no son favorecidas las interpretaciones sutiles que le permitan a las compañías aseguradoras evadir sus responsabilidades y obligaciones. Es por ello que corresponde a los tribunales analizar el contrato de seguros para arribar al sentido y significado que le daría una persona de inteligencia promedio a las palabras y cláusulas contenidas en este tipo de contrato. *Id.*; *PFZ Properties Inc. v. General Accident Ins. Co.*, 136 D.P.R. 881 (1994).

Respecto a la interpretación de toda cláusula de exclusión, la norma prevaleciente requiere que se interprete el contrato de seguros restrictivamente, de forma tal que se cumpla el propósito de la póliza de proveer protección al asegurado, lo que implica que toda ambigüedad debe resolverse en favor del asegurado. *Pagán Caraballo v. Silva*,

supra; *The London Assurance v. Tribunal Superior*, 95 D.P.R. 305 (1967); *Barreras v. Santana*, 87 D.P.R. 227 (1963). Si una cláusula de exclusión aplica claramente a determinada situación, la póliza no cubrirá los daños en cuestión, a pesar de las inferencias que parezcan surgir de las demás cláusulas. *Meléndez Piñero v. Levitt & Sons of P.R.*, 129 D.P.R. 521 (1991).

De otra parte, el Artículo 20.010 del Código de Seguros, 26 L.P.R.A. § 2001, establece que el asegurador que expide una póliza asegurando a una persona por la responsabilidad en que pueda incurrir por las lesiones corporales, muerte o daños a la propiedad causados a una tercera persona, tiene la responsabilidad absoluta por las pérdidas cubiertas por esa póliza. A su vez, el Artículo 20.030, 26 L.P.R.A. § 2003, establece que las persona que sufran daños y perjuicios por causa de un suceso cubierto por la póliza, pueden elegir entre incoar una acción directa contra el asegurador como único demandado, o contra el asegurador y el asegurado conjuntamente; disponiéndose que en tales casos la responsabilidad del asegurador no excederá del límite estipulado en la póliza, independientemente de la cuantía de la pérdida sufrida por el perjudicado.

En *Roldán v. Serra*, 105 DPR 507, 511 (1976), el Tribunal Supremo de Puerto Rico estableció que cuando un perjudicado demanda directamente a la compañía aseguradora, y ésta a su vez, luego de realizar la correspondiente investigación, queda convencida de que la pérdida fue causada por la negligencia de su asegurado, y que según su estimación de los daños entiende que el valor excede los límites de la póliza, tiene el deber de hacerle una oferta de sentencia *bona fide* al perjudicado y de consignar la suma o cantidad que tenga la obligación de pagar, para que el Tribunal lo libere de los efectos de la temeridad.

De otra parte, sabido es que el propósito de las pólizas de seguro es brindar protección al asegurado, por lo que el deber de defender a un asegurado de pleitos en su contra es parte esencial del contrato de seguros y de la cubierta pactada. *Pagán Caraballo v. Silva, supra*. Es decir, entre las obligaciones accesorias impuestas a una aseguradora, como resultado del otorgamiento de un contrato de seguro, se encuentra el deber de proveer representación legal al asegurado en litigios cubiertos por los términos del contrato de seguro. Por tal razón, es práctica usual que los contratos de seguros incluyan cláusulas para establecer la obligación de la compañía aseguradora de proveer representación legal al asegurado ante los reclamos de terceros por daños físicos o a la propiedad, producto de siniestros cubiertos por la póliza. *PFZ Properties Inc. v. General Accident Ins. Co., supra; Pagán Caraballo v. Silva, supra.*

Son dos los propósitos de las cláusulas que establecen dicho deber: (1) obligar al asegurador a asumir la defensa del asegurado ante una reclamación por daños; y (2) ofrecerle derechos respecto a los pormenores de dicha defensa. *PFZ Properties Inc. v. General Accident Ins. Co., supra*; Véase R.E. Keeton & A.I. Widiss, *Insurance Law* 989 (West 1988).

El deber contractual de un asegurador para asumir la defensa legal del asegurado está atado al grado de probabilidad que una persona prudente y razonable entienda que se enfrenta a una posible reclamación de daños producto de un determinado evento asegurado. La determinación sobre si un pleito efectivamente cae bajo los términos de una póliza de seguros, se rige, en primera instancia, por las alegaciones de la demanda. *Véase, Vega v. Pepsi-Cola Bot. Co.*, 118 D.P.R. 661, 665-66 (1987); *Morales Garay v. Roldán Coss, supra; Fernández v. Royal Indeminity Co.*, 87 D.P.R. 859, 863 (1963); *véase además, Boston Old Col. Ins. v. Tribunal Superior*, 104 D.P.R. 517 (1975). Existe la obligación de proveer representación legal por parte de una aseguradora cuando de una interpretación liberal de las alegaciones surge la posibilidad de que el asegurado esté protegido por la póliza. De ser así, la compañía de seguros tiene la obligación de asumir su representación, aunque la acción sea infundada, falsa o fraudulenta, e independientemente de cuál sea el resultado del caso y de su adjudicación final. Cualquier duda se ha de resolver en favor de proveer dicha representación. *PFZ Properties Inc. v. General Accident Ins. Co., supra*; Véase Allan D. Wint, *Insurance Claims and Disputes* § 4.02, a las págs. 132-33 (2da ed., 1988). Por tal motivo, se ha dicho que la obligación de ofrecer representación legal al asegurado es aún más extensa que la obligación de indemnizar por daños, en la medida en que éstos están cubiertos por la póliza de

seguros. *PFZ Properties Inc. v. General Accident Ins. Co., supra*; *Pagán Caraballo v. Silva*, 122 D.P.R. 105, 111-13 (1988); *Vega v. Pepsi Cola Bot. Co., supra*. En algunos casos, el deber de la compañía aseguradora de proveer representación legal existe aun cuando al final del litigio la aseguradora no quede obligada a indemnizar o responder por los daños causados por el asegurado a un tercero. *Pagán v. Caraballo, supra*; *Vega v. Pepsi Cola, supra*, a las págs. 665-67. Procede la imposición de pago de costas y honorarios cuando la compañía aseguradora infringe el deber contractual de ofrecer representación legal. *Pagán Caraballo v. Silva, supra*, a la pág. 113; *Vega v. Pepsi-Cola Bot. Co., supra*; *Mun. of San Juan v. Great American Ins. Co.*, 117 D.P.R. 632 (1986).

No obstante, si las alegaciones claramente excluyen de la cubierta de la póliza los daños reclamados, no podrá imponerse a la aseguradora el deber de defender, pues en tal caso no existe cubierta alguna de seguro. *Vega v. Pepsi Cola Bot. Co., supra*; *Fernández v. Royal Indemnity Co.*, 87 D.P.R. 859 (1963).

## II

La póliza en cuestión es una de responsabilidad pública mediante la cual el asegurado, Iván Cerezo, se comprometió a pagar una prima a cambio de una protección contra los daños que éste pudiese ocasionar mediante accidente automovilístico.

Respecto a la responsabilidad de Universal con el asegurado, la póliza dispone lo siguiente:

*"We will pay damages for "bodily injury" or "property damage" for which any insured becomes legally responsible because of an auto accident. Damages include prejudgment interest awarded against the "insured". We will settle or defend, as we consider appropriate, any claim or suit asking for these damages. In addition to our limit of liability, we will pay all defense costs we incur. Our duty to settle or defend ends when our limit of liability for this coverage has been exhausted. We have no duty to defend any suit or settle any claim for "bodily injury"* ██ *or "property damage" not covered under this policy."* ██

Es decir, la póliza obliga a Universal a pagar por aquellos daños corporales (*"bodily injury"*) o a la propiedad (*"property damage"*), por los cuales el asegurado, Iván Cerezo, fuese legalmente responsable, a consecuencia de un accidente automovilístico. La obligación de defender de la aseguradora culmina tan pronto se haya agotado el límite de la cubierta, viéndose entonces obligado el asegurado a contratar representación legal independiente.

Para resolver las controversias de marras, debemos en primer lugar determinar si Universal había agotado los límites de la póliza al momento de renunciar a la representación legal del asegurado (demandado-recurrente).

Un vistazo a los hechos que no están en controversia muestra que el 11 de septiembre de 2000 Universal consignó $200,000 en la secretaría del tribunal de instancia, alegando que ello representaba el máximo de la cubierta, conforme las constancias del caso, según alegadas en la demanda. La aseguradora también solicitó que se aceptara dicha suma y se le acreditara al pago total que en su día tuviese que hacer el asegurado y se dictase sentencia parcial archivando con perjuicio la causa en su contra.

El 17 de octubre de 2000, el tribunal aceptó la consignación y dictó sentencia parcial desestimando las reclamaciones de la demandada en cuanto a Universal. Acto seguido, el 25 de octubre de 2000 y por conducto de sus abogados, Universal presentó moción ante Instancia mediante la cual notificó que renunciaba a la representación legal del asegurado, Iván Cerezo, y demás codemandados. De tal forma dio por terminada su total obligación contractual con los demandados-recurrentes, tanto en cuanto a cubierta monetaria como de representación legal.

No consta en autos que Universal haya en momento alguno consignado una suma de dinero para cubrir los daños a la propiedad, cuyo límite de cubierta ascendía a $50,000 por accidente. Tampoco surge que Universal hubiese transado o pactado los daños a la propiedad reclamados en la demanda, previo a la renuncia de la representación legal de los asegurados. Por consiguiente, ante la ausencia de pacto al respecto, la sentencia del 17 de octubre de 2000 nada dispone en cuanto a tal partida. Cabe recalcar que para esa fecha la representación legal de los asegurados era la misma de su aseguradora, quienes tenían el deber fiduciario de velar por los mejores intereses de todos sus representados.

No fue hasta el 18 de septiembre de 2001, cuatro meses después de presentada por los aquí recurrentes la moción de relevo de sentencia, ■ que Universal le presentó al tribunal la correspondiente transacción que dio fin a la reclamación de daños a la propiedad reclamados en la demanda. Como se puede apreciar, la mencionada transacción ocurrió once meses luego de que Universal renunciara a la representación legal de los asegurados.

Respecto a esta renuncia por parte de Universal a su obligación contractual, para proveerle a los asegurados una representación legal adecuada, el tribunal de Instancia expresó lo siguiente.

*"Si bien es cierto que cuando se dictó la sentencia parcial a favor de Universal Insurance Company quedaba aún pendiente la reclamación por los daños a la propiedad de los demandantes, para cuya reclamación Universal Insurance Company todavía tenía obligación de proveer cubierta y representación legal, dicha situación no tuvo consecuencia alguna ante la transacción habida posteriormente entre Universal y la parte demandante para compensar los daños a la propiedad por $800."* ■

Tal conclusión resulta insuficiente y no justifica la prematura renuncia de Universal a su responsabilidad de proveer representación legal, conforme a lo estipulado en el contrato de seguro. El tribunal de Instancia llegó a la conclusión de que el mencionado incumplimiento *"no tuvo consecuencia alguna"* sin recibir primero prueba al respecto, a pesar de que ciertamente la situación le ha causado inconvenientes a los recurrentes y ha impedido el flujo natural de los procedimientos, obligando a las partes a asumir personalmente la carga de litigar este asunto ante el tribunal. Lo ocurrido justifica la imposición de costas y honorarios contra Universal, por ser responsable de la confusa situación. Le corresponderá al tribunal de Instancia valorar e imponer las mismas.

### III

Conforme a lo discutido, queda claro que Universal no podía renunciar a la representación legal del asegurado hasta tanto agotara los límites de la póliza conforme a los hechos del caso. Es por ello que no podía renunciar sin antes haber transado la reclamación de daños a la propiedad o haber consignado la totalidad de la cubierta respecto a dicha partida. Sin embargo, resta todavía resolver si Universal estaba obligada a defender judicialmente al demandado, aún después de transigir la acción de daños a la propiedad. Es decir, debemos analizar si Universal extinguió su cubierta respecto a los daños corporales (*"bodily injuries"*) ocasionados a los demandantes, al consignar la suma $200,000 como límite máximo de la cubierta.

Surge de los hechos que la póliza en cuestión tiene límites de $100,000 (por persona) y $300,000 (por accidente) por daños corporales; y $50,000 por daños a la propiedad. Los daños a la propiedad fueron transados en $800.00. Respecto a los daños corporales, Universal consignó $200,000, al alegar que en el caso de marras sólo había dos reclamantes envueltos en el accidente, y que sólo estos dos podían haber sufrido daños corporales directamente. Es decir, pagaron $100,000 por cada una de las persona que a su entender sufrieron un daño directo. Universal defiende su proceder apoyándose, en gran medida, en lo resuelto en *Ferrer v. Lebrón García*, 103 D.P.R. 600 (1975).

Ante tal situación, el tribunal aceptó los $200,000 como la cantidad máxima por la cual en su día Universal sería responsable de pagar, y procedió a dictar sentencia parcial, dando así por resuelto el asunto sumariamente.

En *Ferrer v. Lebrón Garcia, supra*, nuestro mas alto foro discutió el alcance de la frase *"bodily injury"* al fijar el límite aplicable de una póliza de seguro ($25,000/$50,000) en caso de accidente de automóvil.

En aquella ocasión se trataba de una señora que falleció al ser arrollada por el automóvil del asegurado, mientras ésta cruzaba la carretera. La demanda fue instada por el esposo de la víctima y sus dos hijos, quienes se encontraban en las inmediaciones al momento del accidente. De acuerdo con las determinaciones del tribunal de instancia, los tres experimentaron *"angustias físicas y mentales"*. ■

La póliza en controversia tenía un límite de $25,000 por persona, hasta un máximo de $50,000 por accidente o evento. Luego de finalizado el juicio y determinada la negligencia del conductor, el tribunal de instancia le impuso a la compañía aseguradora el pago de $25,000, es decir, la halló responsable hasta el límite de responsabilidad por persona lesionada, al resolver que la difunta fue quien único sufrió lesiones corporales directas. También dispuso que *"para justificar la utilización del límite de $50,000.00 por cada accidente o evento, es necesario que más de una persona sufra daños corporales directos; no basta con la prueba de daños resultantes"*. ■ El Tribunal respaldó dicha conclusión en el análisis de quienes en aquél momento llamó *"el grueso de las autoridades"* ■ en Estados Unidos, guiadas y apoyadas por el *common law*. Ello, a pesar de reconocer que a diferencia de Puerto Rico, en la mayoría de los Estados de la Unión los daños mentales eran todavía un derecho emergente. Señaló, *"[e]n Puerto Rico hemos establecido hace años la recobrabilidad de daños mentales, Cirino v. Fuentes Fluviales, 91 D.P.R. 608, 617 (1964), derecho todavía emergente en muchos estados de Estados Unidos. Comment, Negligently Inflicted Mental Distress: The Case for an Independent Tort, 59 Geo. L. Rev. 1237 (1971)"*. ■

Luego y a la página 604 de su sentencia en *Ferrer v. Lebrón García, supra*, el propio Tribunal limitó el alcance de lo resuelto al añadir:

*"No nos pronunciamos, ya que el asunto no se plantea en el contexto de hechos que provocó la actual controversia, sobre si puede llegarse a un resultado distinto cuando los daños mentales son de tal gravedad que causen lesiones corporales constitutivas de daño directo o primario. Véase: Employers Casualty Insurance Co. v. Foust, 105 Cal. Rptr. 505 (1972)."* ■

El citado caso de *Employers Casualty Insurance Co., supra*, resuelto por la Corte de Apelaciones de California, trata sobre un accidente automovilístico en el cual un chofer atropelló a un niño que cruzaba la calle, provocándole lesiones físicas. Los padres del menor transigieron los daños sufridos por éste, mas no así sus propias alegaciones de daño. Ambos padres, ninguno de los cuales fue impactado directamente por el auto, reclamaron haber sufrido *"severe fright, shock, and emotional distress, and resulting physical injuries"*. ■

Debido a ello, el Tribunal tuvo que interpretar el término *"bodily injury"* para establecer cuál límite de la póliza sería utilizado; es decir, el límite por accidente o el límite por persona. Fraseó la controversia de la siguiente manera, *"the question is whether 'bodily injury' resulting from emotional distress is recoverable under the policy when the person sustaining such injury in the accident was in no way externally touched by the vehicle nor placed in fear of his life"*. ■

Luego de analizado el estado de derecho, el Tribunal de California resolvió que el límite de cubierta aplicable lo era el límite por accidente, ya que los padres del menor, aun cuando no fueron impactados físicamente por el automóvil, sufrieron angustias mentales resultantes en lesiones físicas (*"emotional distress with resulting physical injuries"*). De hecho, dicha Corte fue mas lejos aún al expresar que *"there is no reasonable doubt that emotional distress and resulting physical injuries fall within the legal meaning of the language 'bodily injury'"*. ■

Como podemos apreciar, lo resuelto en *Ferrer v. Lebrón García, supra*, hace 27 años no tuvo el impacto o

el efecto absoluto y final que la recurrida (Universal) le adjudica, respecto a la interpretación del término "*Bodily Injury*". Ello queda evidenciado al tomar en consideración el ya citado penúltimo párrafo de la decisión y lo resuelto en *Employers Casualty Insurance Co.*, *supra*, el cual el nuestro Tribunal Supremo ciertamente tomó en consideración al abrir las puertas a una posible excepción o interpretación alterna.

Lo anterior es compatible además con nuestra tradición civilista en materia de daños ocasionados por la culpa o negligencia, que reconoce desde hace muchos años que la concesión de daños morales sin estar éstos subordinados a la concesión de daños físicos. *Rivera v. Rossi*, 64 D.P.R. 718, 724 (1945). Desde entonces, el Tribunal Supremo ha expresado que no existe diferencia alguna entre daños físicos y daños morales. *Concepción v. A.F.F.*, 92 D.P.R. 488 (1965); *Infante v. Leith*, 85 D.P.R. 26 (1962); *Muriel v. Suazo*, 72 D.P.R. 370 (1951). Ambos podrán siempre dar base a una reclamación.

En el caso de marras, el tribunal de instancia resolvió sumariamente a favor de Universal, cuando el caso se encontraba aún en su etapa inicial. Al así proceder, le permitió a éste renunciar a la representación legal de los asegurados. En aquél momento, la prueba de los demandantes aún no había sido descubierta, por lo que el tribunal sólo tenía constancia de que habían nueve demandantes, y que sólo dos de ellos viajaban en el automóvil al momento del accidente. El tribunal desconocía si alguno de los restantes siete demandantes de alguna manera sufrió angustias mentales o sufrimientos emocionales resultantes en daños o lesiones físicas.

Universal ha desembolsado, hasta el momento, $200,000 en la causa DDP1999-0706 para cubrir los daños corporales sufridos por el fenecido Carlos Oyola Rivera y Ada Vega Vega, a raíz del accidente automovilístico ocurrido el 7 de mayo de 1999. En adición a ello, Universal pagó $80,000 para transigir y dar fin a otra reclamación entablada por un tercero (Jorge del Valle y Griselle Ortega), víctima en el mismo accidente y que había presentado un pleito independiente en el Tribunal Superior de Bayamón, causa núm. DDP1999-0972. Por tanto, hasta el momento, Universal ha consignado o pagado un gran total de $280,000 a consecuencia del accidente aquí relacionado.

Siendo $300,000 el límite de la póliza que aquí nos ocupa, resolvemos que Universal no podía renunciar a la representación legal del asegurado hasta tanto fuese resuelto qué tipo de daños habían sufrido los demás reclamantes. En este momento procesal no resulta claro aún el tipo de lesión o daño que sufrieron los demás reclamantes. Resulta prematuro resolver, en esta etapa de los procedimientos, que los demás reclamantes no sufrieron daño corporal, basado únicamente en el hecho que no eran pasajeros del automóvil. Como ya mencionamos, *Ferrer v. Lebrón García*, *supra*, se abstuvo de resolver si el término "*bodily injury*" podía incluir aquellos casos en que "*los daños mentales son de tal gravedad que causen lesiones corporales constitutivas de daño directo o primario*". ▮ Por tanto, existe aún la posibilidad de que el asegurado sea responsable por daños corporales adicionales a los de los pasajeros del auto, por los cuales también respondería la aseguradora hasta el límite de la póliza; límite que aún no ha sido agotado, como queda ya señalado.

Universal continuará siendo parte en el pleito hasta tanto extinga el límite de la cubierta, o coloque al tribunal en posición de resolver respecto a la naturaleza de los daños reclamados por cada uno de los demandantes.

### Dictamen

Conforme a lo señalado, expedimos el auto solicitado, y revocamos lo resuelto por Instancia. Ordenamos que se dicte la moción de relevo de sentencia solicitada por la parte recurrente. Devolvemos el caso al tribunal de Instancia para que se continúen los procesos conforme a lo aquí señalado y resuelto. Universal está obligada por el contrato de seguros a continuar ofreciendo representación legal a su asegurado mientras no se agote el remanente de $20,000 en la cubierta de la póliza.

Lo acordó el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 2002 DTA 131

**1.** También incluyeron como demandados a Bansander Leasing, al Banco Santander y a su compañía aseguradora, por ser esta entidad bancaria la titular del vehículo.

**2.** El contrato de seguro en cuestión ofrece la siguiente definición:

"*Bodily injury*" means bodily harm, sickness or disease, including death that results.

Alegato de la parte apelada, Ap. a la pág. 14B.

**3.** Alegato de la parte apelada, Ap. a la pág. 15.

**4.** La parte demandante-recurrente presentó "*Solicitud de Orden y Solicitud de Relevo de Sentencia al amparo de la Regla 49.2 de Procedimiento Civil*" el 7 de mayo de 2001. Petición de *Certiorari*, Ap. a las págs. 62-64.

**5.** Escrito de *Certiorari*, Ap. a la pág. 204.

**6.** *Lebrón García, supra*, a la pág. 602.

**7.** *Id.* a la pág. 604.

**8.** 15 Couch, *On Insurance* 2d § 56:44; 8 Appleman, *Insurance Law and Practice* § 4893; 8 Blashfield, *Automobile Law and Practice*, § 345.2, a las págs. 458-59; *New Amsterdam Casualty Co. v. Hart*, 16 So.2d 118 (Fla. 1943); *Clark v. Hartford Accident and Indemnity Co.*, 457 S.W.2d 35 (Tenn. 1970); *Smith v. State Farm Mutual Auto Ins. Co.*, 477 S.W. 2d 186 (Ark. 1972).

**9.** *Lebrón García, supra*, a la pág. 604.

**10.** *Id.*

**11.** *Employers Casualty Insurance Co., supra*, a la pág. 507.

**12.** *Id.*

**13.** *Id.* a la pág. 509. Al respecto también expresó lo siguiente: "*this court finds the term 'bodily injury' in appellant's policy covers bodily or physical injury even where such injury is proximately caused, not by direct collision, but by emotional distress induced directly or indirectly by such collision*". *Id.* a la pág. 508.

**14.** *Lebrón García, supra*, a la pág. 604.